# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| SHANE CLARK,<br><br>      Plaintiff,<br><br>v.<br><br>NATHAN HAYNES, CHRISTOPHER WINTERS, KYLE DEMERS, PATRICK MAHONEY, SERGEANT NATHAN WOLF, LACEE SMELCER, COLETTE HLYSTEK, JIMMY MUTCHIE, and CO BRITTANY MCCUTCHEON,<br><br>      Defendants. | Case No. 18-CV-809-JPS<br><br>**ORDER** |

On October 26, 2018, the Court permitted Plaintiff to proceed on a claim that his Eighth Amendment rights were violated when he was denied prescribed psychotropic medication while on suicide observation at Waupun Correctional Institution ("WCI"). (Docket #23). Defendants are Nathan Haynes ("Haynes"), Christopher Winters ("Winters"), Kyle Demers ("Demers"), Patrick Mahoney ("Mahoney,") Sergeant Nathan Wolf ("Wolf"), Lacee Smelcer ("Smelcer"), Colette Hlystek ("Hlystek"), Jimmy Mutchie ("Mutchie"), and Brittany Woda, née McCutcheon ("Woda") (collectively "Defendants"), who are all employees at WCI.[1] Defendants have filed a motion for summary judgment, which is now fully briefed.

---

[1] Plaintiff named two other defendants, Officers Wood and Bilk, whose names appear on the observation logs discussed below. Despite the fact that Officers Wood and Bilk were employees at WCI during the relevant time, the Wisconsin Department of Justice was unable to identify these defendants. Accordingly, they were never served, and ultimately dismissed from the case without prejudice. (Docket #27).

(Docket #34). The Court has considered the motion and will grant it in part and deny it in part for the reasons explained below.

1. **LEGAL STANDARD**

Federal Rule of Civil Procedure 56 provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). The Court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The party opposing summary judgment "need not match the movant witness for witness, nor persuade the [C]ourt that [his] case is convincing, [he] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).[2]

---

[2]Plaintiff has failed to oppose Defendants' proposed statement of facts; therefore, to the extent Defendants' proposed facts are uncontroverted, those facts will be admitted for summary judgment purposes only. Civ. L.R. 56(b)(4). However, "a district court cannot properly act upon a motion for summary judgment without giving the opposing party a 'reasonable opportunity' to submit affidavits that contradict the affidavits submitted in support of the motion." *Ross v. Franzen*, 777 F.2d 1216, 1219 (7th Cir. 1985). Moreover, "when dealing with summary judgment procedures[,] technical rigor is inappropriate where

## 2. RELEVANT FACTS

### 2.1 Background

In March 2017, Plaintiff had been prescribed Aripiprazole, an antipsychotic; Hydroxyzine, an antihistamine that treats anxiety; and Gabapentin, an anticonvulsant that treats pain. He was taking these medications at regular intervals on a daily basis. *See* (Docket #45-1 at 1). These medications are psychotropic pharmaceuticals that were used to treat Plaintiff's depression, anxiety, and mood disorder. On March 4, Plaintiff submitted a medication refill request form seeking more Gabapentin, Hydroxyzine, and Aripiprazole. (Docket #46-1 at 18). That same day, he submitted a Health Services Request ("HSR") for psychiatric assessment and medication adjustment. *Id.* at 10. On March 8, he submitted another HSR seeking a refill of Gabapentin, which was received by the Health Services Unit ("HSU") on March 9—the same day Plaintiff was placed under observation for suicidal ideation. (Docket #43-2 at 9).

On March 9, Plaintiff submitted a Psychological Service Request for evaluation in which he explained that he felt like "snapping." (Docket #46-2 at 9). Before this request was received, *id.*, Plaintiff told Woda, who was conducting medication rounds, that he was experiencing suicidal ideation. Woda escorted Plaintiff to a separate cell and drafted an incident report. Woda informed Haynes, her supervisor, of the situation, and Haynes requested that Plaintiff be evaluated by the Psychological Services Unit ("PSU"). At the PSU's recommendation, Plaintiff was placed under suicide

unresponsive and uninformed prisoners are involved." *Id.* Therefore, if any of the evidence that Plaintiff has filed in support of his opposition—including his declaration—contradicts one of Defendants' proposed facts, then that fact will be considered in dispute.

observation, and transferred to a specific unit known as the Restrictive Housing Unit ("RHU") for monitoring. Woda, who drafted the incident report that prompted Plaintiff's transfer to the RHU, does not recall Plaintiff or any discussion involving his medication. This was the extent of Haynes's and Woda's involvement in the situation.

Thereafter, Plaintiff was under clinical observation from the evening of March 9 to the morning of March 13. On March 9, he submitted an HSR stating that he had been moved to a different unit, and requested that his medications be forwarded, too. (Docket #46-1 at 8). That HSR was received on March 10, when an employee confirmed that "meds went to RHU on 3-9-17." *Id.* However, Plaintiff did not receive them.

### 2.2 Observation

While under observation at the RHU, Plaintiff's activity was monitored every fifteen minutes by correctional officers who recorded his activity in a designated observation log. The observation logs contain a box for correctional officers to indicate if an inmate received or declined medication. The observation logs for Plaintiff begin on March 9, 2017 at 9:15 p.m. and end on March 13, 2017 at 8:45 a.m. (Docket #43-3). The only documentation in the observation logs regarding medication occurred on March 11 at 6:15 a.m. and March 12 at 7:15 a.m., at which times Smelcer observed Plaintiff accept medication. *Id.* at 10, 16. However, a corresponding medication log, which tracks when prescribed medications are distributed and whether the prisoner accepts or denies the medication, indicates that medication was not distributed to Plaintiff on the morning of March 11. (Docket #45-1 at 1). Curiously, the medication log also indicates that medication was distributed the evenings of March 10 and 11, and

throughout the day on March 12 and March 13. *Id.* In other words, the observation logs and the medication log contradict one another.

It is WCI protocol for officers who receive any medical concerns from inmates to contact the HSU and the on-duty nurse. No such concerns were relayed to HSU regarding Plaintiff's medication while he was under suicide observation at the RHU. The officer defendants who monitored Plaintiff while he was under confinement—i.e. Wolf, Demers, Mahoney, Hlystek, Mutchie, Smelcer, and Winters—will be referred to, collectively, as the "RHU officers." Each officer's interaction with Plaintiff will be described below.

### 2.2.1 Defendant Wolf

Wolf was a sergeant who supervised the RHU during the afternoon of March 10. He conducted one round on March 10, at 5:45 p.m. (Docket #43-3 at 7). During this round, Plaintiff states that he told Wolf that he was suffering from withdrawal and asked for his medication. According to Plaintiff, Wolf told him that he was already aware of the situation, but it was the nurse's job to provide medication, not his. (Docket #50 at 4). However, the inmate complaint examiner's response to Plaintiff's subsequent complaint about this issue suggests that it actually was staff's responsibility to transfer medication information to the RHU. (Docket #49-1 at 15). There is no evidence that Wolf followed up with the nurse on duty, or with other staff members regarding Plaintiff's medication.

### 2.2.2 Defendant Demers

Demers conducted rounds in the afternoon and evening of March 10 and observed Plaintiff pacing in his cell and laying on the bed. (Docket #43-3 at 5). Plaintiff attests that around noon, Plaintiff told Demers he was experiencing withdrawal and had vomited his breakfast, which he is

recorded as having received at 10:30 a.m. *Id.*; (Docket #50 at 3). According to Plaintiff, Demers told him to lay down and try to sleep. (Docket #50 at 3).

### 2.2.3 Defendant Mahoney

Mahoney conducted rounds during the afternoon and evening of March 10. (Docket #43-3 at 6–7). Mahoney recorded Plaintiff lying in bed, sitting on the bed, eating, and standing at the door. *Id.* At one point, Plaintiff asked Mahoney a question about the PSU, but Mahoney does not recall whether the question pertained to medication. *See* (Docket #43-3 at 7). Plaintiff attests that at this time, he told Mahoney that he was two days behind on his medication and was suffering withdrawal. (Docket #50 at 3–4). According to Plaintiff, Mahoney responded that he would see if his meds were available. *Id.* at 4. However, Plaintiff claims he did not receive medication during the "meds pass" that evening, and when Plaintiff complained about it, Mahoney told him to ask someone else. *Id.*

### 2.2.4 Defendant Hlystek

Hlystek conducted several rounds during the morning and early afternoon of March 11. (Docket #43-3 at 10–12). She recorded Plaintiff laying on his bed and pacing. *Id.* Plaintiff claims that he alerted Hlystek that he was going through "several withdrawals. . .including profuse sweating, hotflashes, vomiting, pins and needles type itching all over [his] body, and [] suicidal ideation." (Docket #50 at 5). Hlystek, in turn, did nothing to address Plaintiff's medical issue. Hlystek does not remember Plaintiff or any issues with his medication or withdrawal symptoms. Nothing in the observation logs document Plaintiff's complaints.

### 2.2.5 Defendant Mutchie

Mutchie conducted rounds during the evening of March 11. (Docket #43-3 at 13–14). Mutchie recorded Plaintiff laying on the bed, moving.

Mutchie did not record anything else. Plaintiff claims that he told Mutchie about his lack of medication two or three times, requesting a nurse and medication. According to Plaintiff, Mutchie told defendant that "he would have to wait and there is nothing they could do." (Docket #50 at 5).

### 2.2.6 Defendant Smelcer

Smelcer and Hlystek conducted rounds the morning of March 11, and Smelcer conducted rounds the morning of March 12. (Docket #43-3 at 10–17). Among other routine observations, Smelcer recorded that Plaintiff received his medication on the morning of March 11, *id.* at 10, and again the morning of March 12, *id.* at 16. According to Plaintiff, he alerted her throughout her shift of the "severe withdrawals" he was going through "including profuse sweating, hotflashes, vomiting, pins and needles type itching all over my body, and the suicidal ideation." (Docket #50 at 5). He believes that she falsified her report that he received medication on the mornings of March 11 and 12 in order to cover up the "severe withdrawal symptoms" that he was experiencing while she passed out medication. *Id.* at 4.

Smelcer's observation logs are at odds with the medication logs. She indicated that Plaintiff received medication the mornings of March 11, (Docket #43-3 at 10), but the medication log suggest that that Plaintiff did not receive medication on the morning of March 11, (Docket #45-1 at 1). She also failed to record any receipt or denial of medication at noon on March 12, (Docket #43-3 at 17), even though Plaintiff's medication logs suggest that he did receive medication at noon on March 12, (Docket #45-1 at 1).

### 2.2.7 Defendant Winters

Winters conducted a round on the morning of March 10, and worked with Hlystek to conduct rounds mid-day on March 11. (Docket #43-3 at 4,

11–12). According to Plaintiff, on March 10, he told Winters that he had not received his medication in two days and was going through withdrawal. Winters told him that he would "see what he could do." (Docket #50 at 3). Plaintiff complained to Winters again on March 11. *Id.* at 5. Winters does not recall any conversation with Plaintiff regarding his medication. There is no evidence that Winters told HSU or the nurse on duty about Plaintiff's alleged complaints.

### 2.3 After Observation

Once released from observation, Plaintiff submitted a complaint alleging that he had not received his prescribed medications while in the RHU. *See* (Docket #49-1 at 15). The inmate complaint examiner affirmed the complaint, and stated the following:

> Inmate Clark was placed in Obs[ervation] on the morning on 3/9/17. It appears by the medication log that his medication was not sent over to the RHU until later in the day on 3/10. At that time he was offered and refused his late afternoon and bedtime meds. He then was not offered any meds on first shift 3/11/17 and his late afternoon and bedtime meds he received. RHU did not know why he did not receive his medication on first shift.
>
> Recommendation is to affirm that inmate did not receive his medication on 3/9 or on first shift 3/10 and 3/11. A copy will be sent to [prison staff] for the purposes of staff distributing medication and the transfer of medication when an inmate is taken to RHU.

*Id.* This finding contradicts the observation logs, which indicate that Plaintiff actually did receive his medications the morning of March 11 and March 12, but no other time. (Docket #43-3 at 10, 16). However, the finding is consistent with the medication log, which indicates that Plaintiff missed

Page 8 of 18

some medication on March 9 and the mornings/afternoons of March 10 and 11, but was offered dosages in the evenings. (Docket #45-1 at 1).

On March 13, once released from the RHU, Plaintiff filed an HSR asking why his dose of Aripiprazole was reduced and complaining that he had been without the medication for over a week. (Docket #46-1 at 6). On March 16, Plaintiff submitted another HSR in which he stated that he had not received his Aripiprazole for two weeks and his Hydroxyzine for one week. *Id.* at 4.

3.  **ANALYSIS**

The Eighth Amendment's "deliberate indifference" standard requires that (1) a prisoner suffered from an objectively serious medical condition; (2) the government official subjectively knew of the condition and was deliberately indifferent in treating it; and (3) this indifference caused the prisoner's injury. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

There is no serious dispute as to whether Plaintiff's need for psychotropic medication constitutes a serious medical condition. "A serious medical condition is one that has been diagnosed by a physician as mandating treatment." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005); *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019) (finding that a prisoner's schizoaffective diagnosis, symptoms, and "multiple prescriptions for psychotropic medications firmly establish that he suffered from an objectively serious medical condition."). Defendants attempt to reframe the serious medical risk as physical withdrawal symptoms, *see* (Docket #35 at 13–14), for which they were not on notice. But that is neither the crux of Plaintiff's complaint, *see* (Docket #20 at 1), nor how the Court framed the issue at screening, *see* (Docket #23 at 1–2) (describing Plaintiff's allegations

and finding that the alleged "denial of his psychotropic medication" was sufficient to state a claim under the Eighth Amendment). On this point, the evidence is clear that while Plaintiff was under suicidal observation, Defendants failed to administer his prescribed psychotropic medication.

The critical question is whether Defendants were deliberately indifferent to the fact that Plaintiff had not received his prescribed medication while he was on suicide observation. The deliberate indifference inquiry has two components. "The official must have subjective knowledge of the risk to the inmate's health, and the official also must disregard that risk." *Gayton*, 593 F.3d at 620. Even if an official is aware of the risk to the inmate's health, he is not liable if he "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844; *Estate of Novack ex rel. Turbin v. Cty. of Wood*, 226 F.3d 525, 529 (7th Cir. 2000); *Fisher v. Lovejoy*, 414 F.3d 659, 662 (7th Cir. 2005).

Establishing deliberate indifference is a heavy burden; the Seventh Circuit has emphasized that deliberate indifference "comprehends more than mere negligence but less than the purposeful or knowing infliction of harm." *Estate of Novack*, 226 F.3d at 529; *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002). Indeed, the Court of Appeals has characterized the required showing "as 'something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks.'" *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006) (quoting *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992)). The operative inquiry is not whether the inmate believes some other course of treatment would have been better. *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996); *Reynolds v. Barnes*, 84 F. App'x 672, 674 (7th Cir. 2003) ("[T]he Constitution does not mandate that a prisoner receive exactly the medical treatment he desires."). But while negligence and medical malpractice do

not give way to constitutional liability, "to prevail on an Eighth Amendment claim 'a prisoner is not required to show that he was literally ignored.'" *Greeno*, 414 F.3d at 653 (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)). With these principles in mind, the Court will analyze each defendant's responsibility in turn.

### 3.1 Defendant Woda

Plaintiff told Woda that he was having suicidal thoughts on the evening of March 9. The evidence shows that Woda responded to Plaintiff's complaints by promptly taking him away from his cell, informing her supervisor, and drafting an incident report that was forwarded to the PSU, HSU, and the RHU. *Farmer*, 511 U.S. at 844 (no liability if a person "respond[s] reasonably to the risk, even if the harm ultimately was not averted."). As a result of Woda's actions, Plaintiff was placed under observation.

There is some dispute as to whether Woda knew about Plaintiff's lapse in medication. However, even if Woda did know that Plaintiff was suffering from missed medication, her response to the situation—which entailed notifying her supervisor, the PSU, and the HSU, and removing Plaintiff to a place where his symptoms would have less dire consequences—all furthered Plaintiff's care. There is no evidence that Woda acted intentionally in failing to ensure that Plaintiff's medication was continued, nor is there any evidence that Woda perceived the risk of failing to medicate Plaintiff and consciously ignored it. Rather, the evidence demonstrates that Woda took the appropriate steps to ensure that Plaintiff received psychiatric services and monitoring in a timely fashion. It is true that Woda did not indicate that Plaintiff was suffering from a lapse in medication on her incident report, nor did she share this information with

Haynes. If she knew that Plaintiff was suffering from a lapse in medication, then this failure would reflect negligence. But as this Court has said before, constitutional liability does not flow from negligence. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) ("Neither medical malpractice nor mere disagreement with a doctor's medical judgment is enough to prove deliberate indifference in violation of the Eighth Amendment."). Accordingly, the claim against Woda must be dismissed.

### 3.2  Defendant Haynes

Haynes learned that Plaintiff had suicidal thoughts from Woda. In response to this information, Haynes ordered that Plaintiff be evaluated by the PSU. Based on the PSU's recommendation, Plaintiff was placed under suicide observation. This was the extent of Haynes' involvement in the situation.

Like Woda, Haynes responded reasonably to the risk that Plaintiff's mental health condition posed by ordering a psychiatric evaluation, which resulted in Plaintiff being placed under observation. *Farmer*, 511 U.S. at 844. If Haynes knew that Plaintiff was in need of medication and was suffering from withdrawal, this was a reasonable response. However, also like Woda, Haynes did not take any steps to ensure that Plaintiff's medication would be continued during this mentally precarious time—a failure that reflects serious negligence, possibly even gross negligence. This is particularly true because Plaintiff had already submitted a medication refill request, which presumably should have been communicated with the PSU. Yet negligence is not enough for constitutional liability. *Berry*, 604 F.3d at 441. There is no evidence that Haynes intentionally avoided giving Plaintiff's access to medication, or that he was aware that Plaintiff had not been receiving his

medication and consciously ignored the risk that posed. Accordingly, the claim against Haynes must be dismissed.

### 3.3 RHU Officer Defendants

Demers, Wolf, Hlystek, Mutchie, Smelcer, Mahoney, and Winters were all correctional officers who worked in WCI's RHU unit between March 9 and March 13. Each of these officers participated in monitoring Plaintiff's activities in fifteen-minute intervals in order to ensure that he did not harm himself. Each profess not to recall any issue involving Plaintiff's medication. Each claim that they observed no withdrawal symptoms.

The observation logs indicate that the RHU officers were assigned the same task and sometimes acted in concert during their shifts. Each officer recorded Plaintiff at the appropriate dates and times, and included a short phrase documenting what Plaintiff was seen doing at the time of the observation. None of the RHU officers observed Plaintiff engaging in any activity that would suggest withdrawal, and none of the RHU officers recall speaking with Plaintiff about his medication.

For his part, Plaintiff attests that he informed each officer that he was suffering from a lapse in medication or withdrawal and requested his medication. There is no evidence that any officer did anything in response to these complaints. For example, there is no evidence that the officers informed the HSU, filled out an incident report, or called for a nurse, as protocol might suggest. Defendants submit that had they known Plaintiff needed medication, they would have done one or all of these things—and the fact that they did not proves that Plaintiff is lying.

However, it is not as simple as that. While the RHU officers have provided evidence—in the form of their own testimonies and the observation logs—that they conducted their rounds diligently and

observed nothing out of the ordinary, Plaintiff has risen to the task of creating a genuine issue of material fact as to whether they knew that he had not received his psychotropic medication and were deliberately indifferent to the risk that posed. To begin with, the evidence demonstrates that Plaintiff did not receive his prescribed psychotropic medication for at least two days, possibly more. Plaintiff was admitted to the PSU after a day of not receiving his medication because he felt suicidal. The day that he was transferred to the RHU for observation, he submitted a form to the HSU to inform them that his cell had changed. While at the RHU, Plaintiff claims that he requested his medication several times to the RHU officers when they conducted rounds, which occurred every fifteen minutes. The officer defendants claim that they have no recollection of this happening, and there is scant record of these requests. There is one recorded instance in which Plaintiff asked Mahoney about the PSU, but Mahoney does not remember the substance of the conversation. However, the observation logs and the medication log contradict each other, making it unclear when or whether Plaintiff began receiving his medication again. Finally, when Plaintiff emerged from the RHU, he submitted another inmate complaint form regarding his lack of medication, which was affirmed.

  If a jury believes Plaintiff's testimony that he told the RHU officers when they conducted rounds that he had not received his prescribed medication and was suffering, then they could reasonably find that the RHU officers were subjectively aware of the serious medical need. Defendants' argument that the observation logs are generally silent on the issue is not dispositive, as the logs' accuracy is cast into doubt by the contradictory entries in the medication log. Moreover, nothing in the record indicates that the RHU officers attempted to respond to the risk in any

manner whatsoever, such as by speaking with a nurse or informing the HSU. Nor is there any evidence that the officers were acting under orders from a medical professional not to medicate Plaintiff. Thus, if a jury finds Plaintiff credible, they might also conclude that the officers were deliberately indifferent to Plaintiff's serious medical need in violation of the Eighth Amendment.

### 3.4 Causation and Injury

Defendants contend that Plaintiff has not established an issue of material fact as to whether Defendants' conduct caused Plaintiff's injury or if, in fact, there was any injury at all. Causation is generally a question of fact for the jury to decide. *Shick v. Ill. Dep't of Human Servs.*, 307 F.3d 605, 615 (7th Cir. 2002) ("While generally the issue of proximate cause is a jury question, in extreme circumstances ... the question of proximate cause is an issue of law properly resolved by a court."); *Gayton*, 593 F.3d at 624 (in addressing a claim for deliberate indifference to an inmate's medical needs under the Eighth Amendment, "[p]roximate cause is a question to be decided by a jury, and only in the rare instance that a plaintiff can proffer no evidence that a delay in medical treatment exacerbated an injury should summary judgment be granted on the issue of causation."). The issue may only be resolved on summary judgment "when there is no evidence from which a jury could reasonably find the required proximate, causal nexus between the careless act and the resulting injuries." *Johnson v. City of Philadelphia*, 837 F.3d 343, 352 (3d Cir. 2016). The Court is satisfied that a reasonable jury could find causation between the officers' ignoring Plaintiff's alleged requests for medication and his subsequent mental distress.

As to Plaintiff's alleged injury, "[n]ominal damages may be awarded when the Eighth Amendment has been violated but no actual injury is established." *Tate v. Troutman*, 683 F. Supp. 2d 897, 908 (E.D. Wis. 2010) (citing *Calhoun v. DeTella*, 319 F.3d 936, 941–42 (7th Cir. 2003)). In this case, Plaintiff seeks compensatory damages for the physical, mental, and emotional injuries he suffered, as well as punitive damages. (Docket #20 at 5). While there does not appear to be evidence of physical injuries associated with the lapsed medication, Plaintiff also claims mental distress and suicidal ideation—injuries to which only he is a witness. It is for the jury to determine whether he is credible, and whether any injuries merit compensation.

### 3.5 Qualified Immunity

Qualified immunity shields officials from the civil consequences of their constitutional violations when the law did not put the officials on clear notice that their conduct would be unlawful. *Saucier v. Katz*, 533 U.S. 194, 202 (2001); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (holding that the doctrine protects officials from civil liability when they perform discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."). "Put simply," says the Supreme Court, "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The test for qualified immunity is (1) whether the defendants' alleged actions violated the plaintiff's constitutional rights; and (2) "whether the implicated right was clearly established at the time." *Jones v. Wilhelm*, 425 F.3d 455, 461 (7th Cir. 2005). Once the defense is raised, the

plaintiff bears the burden to defeat it. *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015). To overcome an assertion of qualified immunity, Plaintiff must proffer facts which, if believed, would amount to a violation of his constitutional rights. *Katz*, 533 U.S. at 201. As the discussion above shows, Plaintiff has done this. Next, Plaintiff must show that the violation of his constitutional rights was "clearly established under applicable law at the time and under the circumstances that the defendant official acted." *Easterling v. Pollard*, 528 Fed. App'x 653, 656 (7th Cir. 2013).

A right is clearly established if "a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Factually identical precedent is not necessary; the guiding question is whether the official would have had "fair warning" that the conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "Deliberately ignoring a request for medical assistance has long been held to be a form of cruel and unusual punishment." *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996). Accordingly, if each of these officers knew that Plaintiff was not receiving his prescribed psychotropic medication while at the RHU but ignored his requests for medical assistance and/or falsified the logs, then qualified immunity would not apply.

**4.     CONCLUSION**

For the reasons explained above, Plaintiff's claims for deliberate indifference against Woda and Haynes must be dismissed; the evidence does not suggest that they consciously disregarded a serious medical risk. However, the correctional officers that monitored Plaintiff in the RHU are a different story. The evidence creates a genuine issue of fact as to whether each of them knew that Plaintiff had suffered a lapse in medication, heard Plaintiff's request for medication, and ignored his pleas. Most of the

evidence comes down to testimony from either side, but the inconsistent observation logs and medication log contributes to the lack of clarity surrounding when and whether Plaintiff began receiving his medication again. These inconsistencies bear on whether the RHU officers acted willfully in ignoring Plaintiff's requests for medication. This is not a case in which Plaintiff claims constitutional injury, yet the overwhelming weight of evidence demonstrates that what he claims could not have happened. Rather, this is a case in which testimony must be weighed, and contradictory evidence must be considered. This is a case for the jury.

**IT IS ORDERED** that Defendants' motion (Docket #34) be and the same is hereby **GRANTED in part and DENIED in part**;

**IT IS FURTHER ORDERED** that the Eighth Amendment claims against Defendants Brittany Woda, née McCutcheon, and Nathan Haynes be and the same are hereby **DISMISSED with prejudice**; and

**IT IS FURTHER ORDERED** that Defendants Brittany Woda, née McCutcheon, and Nathan Haynes be and the same are hereby **DISMISSED from the action**.

Dated at Milwaukee, Wisconsin, this 20th day of March, 2020.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge